UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **07-22469-CIV-SEITZ/MCALILEY**

SECURITIES AND EXCHANGE COMMISSION,   )
                                      )
                          Plaintiff,  )
v.                                    )
                                      )
                                      )
HSBC BANK USA, N.A.,                  )
                                      )
                          Defendant.  )
_____)

FILED by __JC__ D.C.
ELECTRONIC

Sept. 19, 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges:

### I.   JURISDICTION AND VENUE

1.   This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a).

2.   Venue is proper because Defendant HSBC Bank USA, N.A. ("HSBC") conducts business in the Southern District of Florida and because many of the Defendant's acts and transactions constituting violations of the Securities Act occurred in the Southern District of Florida.

### II.   DEFENDANT

3.   HSBC is a national banking association with its principal place of business in Wilmington, Delaware. HSBC operates in nine states in the United States, including Florida. HSBC is the principal subsidiary of HSBC USA Inc., which has certain publicly-traded preferred shares that are listed on the New York Stock Exchange. HSBC USA Inc. is an indirect, wholly-owned subsidiary of HSBC North America Holdings, Inc., which, in turn, is a wholly-owned

indirect subsidiary of HSBC Holdings, plc ("HSBC Holdings"), a public limited company organized in the United Kingdom. HSBC Holdings' ordinary shares are admitted to trading on the London Stock Exchange and are listed on The Stock Exchange of Hong Kong, Euronext Paris and the Bermuda Stock Exchange and its American depository shares are listed on the New York Stock Exchange.

### III.   OTHER RELEVANT ENTITY

4.     Pension Fund of America, L.C. ("Pension Fund") is a Florida limited liability corporation formed in June 1999, with its principal place of business in Coral Gables, Florida. Pension Fund is not registered with the Commission in any capacity. Pension Fund offered unregistered securities in the form of retirement and college "trust plans" that purported to have an investment and insurance component. On March 28, 2005, the United States District Court for the Southern District of Florida appointed a receiver over Pension Fund and its affiliated entities in an emergency action filed by the Commission to halt Pension Fund's offering fraud. Securities and Exchange Commission v. Pension Fund of America, L.C., et al., Case No. 05-20863-CIV-MOORE (S.D. Fla.).

### IV.   FACTUAL ALLEGATIONS

5.     From at least 1999 through March 28, 2005 ("the Relevant Period"), Pension Fund and its principals offered and sold "trust plans" that purported to contain both an investment component and an insurance component. Using a network of over 500 independent sales agents, Pension Fund marketed the trust plans to individuals who primarily lived in Central and South America, raising at least $127 million from over 3,400 investors.

2

6. In connection with its offer and sale of the trust plans, Pension Fund made material misrepresentations and omissions to investors. Among other things, Pension Fund failed to disclose to investors in its "Liberty Plan" that during the first year of the investment up to 95% of their funds were used to pay exorbitant commissions to sales agents, administrative fees, and other costs. Pension Fund also charged investors in its "Capital Plan" undisclosed, average fees of 30% on their investments. Pension Fund falsely told investors that their investments would be held "in trust" by the U.S. bank or broker-dealer servicing Pension Fund's trust plans at the time. However, with one exception, none of the various U.S. banks and broker-dealers which served as a trustee and/or custodian in connection with the investment component of Pension Fund's trust plans actually executed trust agreements directly with the investors. Pension Fund also forged certificates ostensibly issued by the financial institutions, and lulled investors with annual statements depicting false returns. Pension Fund's principals also misappropriated tens of millions of investors' funds.

7. In August 2003, HSBC agreed to accept Pension Fund as a new customer and serve as trustee for the investment component of the Pension Fund trust plans and executed a Master Trust Agreement, which defined the terms and scope of HSBC's duties as trustee. Specifically, under the Master Trust Agreement, HSBC would serve as trustee for the investment component of the Pension Fund plans and create a Master Trust Account to hold the assets designated by Pension Fund as the investment component of the investors' trust plans. The Master Trust Agreement, printed only in English, also indicated that HSBC's duties were limited to acting as custodian of the investment component of the plan, receiving investor funds, retaining custody of those funds in sub-accounts and investing or disbursing investor funds as directed by Pension Fund. The Master Trust Agreement gave Pension Fund the right to use

3

HSBC's name and logo in Pension Fund's marketing materials. Pension Fund prepared new offering materials purportedly reflecting the new relationship with HSBC, and provided the offering materials to HSBC for its review and approval. The offering materials included two contracts titled "Guide to Plan Provisions" and "Plan Transfer Provisions" (collectively "Plan Provisions"), and two glossy marketing brochures.

8.  The marketing brochures, printed in both Spanish and Portuguese, contained a general overview of Pension Fund's plans and included HSBC's logo, pictures of HSBC's corporate headquarters, and other general information about HSBC. The brochure stated that HSBC was the "second largest commercial bank in the world." In addition, the marketing brochures represented that: "Pension Fund and HSBC Bank, USA have created the Liberty Trust Plan for you." The brochures further assured investors of the safety of their funds, describing HSBC as the investors' trustee and claiming, "Your money is in the best hands – HSBC Bank, USA." The marketing brochures provided a list of mutual funds offered as part of the trust plans. Pension Fund's marketing brochures did not disclose information about the sales commissions, administrative expenses, or the front load mutual fund fees charged to the investor. These marketing brochures also did not include information about any limitations to HSBC's role as trustee.

9.  The Plan Provisions provided more details about the trust plans' investment and insurance components, and included HSBC's logo and the legend "HSBC Bank USA as Trustee" on the cover page. The Plan Provisions defined "Trustee" as "HSBC Bank USA, which shall serve as trustee for the Investment Component of the Plan in accordance with the provisions of the Master Trust Agreement." The Plan Provisions generally disclosed that up to 80% of the investor's initial contribution in the Liberty Plan would be used to pay "plan expenses," which

4

were generally defined as the cost of insurance, the fees associated with purchasing the mutual funds selected by the investor, sales commissions and brokerage fees, and other "administrative fees." The Plan Provisions did not provide a specific breakdown of the nature and specific amount of all the fees and costs associated with the plans, nor did it disclose that up to 50% would be used to pay commissions to sales agents.

10. During the Relevant Period, HSBC had procedures in place providing for the review of any materials using the HSBC name or logo. When reviewing Pension Fund's new marketing materials, HSBC failed to follow its own internal marketing approval procedures. Although the relationship representatives forwarded the marketing brochures to the marketing department for review, neither the relationship representatives nor the marketing department forwarded the materials to the compliance and legal departments, or HSBC Group Offices in London, for a substantive review of the language in the marketing materials. While HSBC did send the Master Trust Agreement and Plan Provisions to outside legal counsel for review, neither of the marketing brochures were reviewed by HSBC's compliance and legal departments, or outside counsel, for the purpose of assessing the adequacy of the representations and disclosures in those materials.

11. After the execution of the Master Trust Agreement, HSBC discussed with Pension Fund using off-shore mutual funds, because Pension Fund represented to HSBC and the marketing brochures expressly stated that the trust plans could not be sold in the U.S. and were not available to U.S. citizens or residents. Pension Fund agreed, stating that its only requirement was that the funds have name recognition and that the available selection included a variety of funds. HSBC identified a variety of off-shore mutual funds similar to the domestic funds Pension Fund previously had been offering. Since Pension Fund had agreed that HSBC could

5

keep any of the loads paid by the mutual funds in connection with the trust plans, one of the significant factors considered by the relationship representative was the amount of front load fees paid by the mutual funds selected. Neither the amount of these sales loads, nor HSBC's role in the funds' selection, were disclosed to investors. HSBC created a Master Trust Account to hold the mutual fund shares purchased on behalf of Pension Fund investors. The mutual fund selections were included in the investor application provided to prospective investors with the revised offering materials.

12. Pension Fund distributed the revised offering materials to its prospective investors, and instructed certain investors to make their contribution checks payable to HSBC. Pension Fund remitted the checks for deposit to a "Gross Premium" account in the name of Pension Fund, which essentially functioned as a checking account. Pension Fund then provided weekly transmittal reports to HSBC that instructed HSBC as to how much to invest in each of the mutual funds selected, and how much should remain in the "Gross Premium" account (or be transferred to another Pension Fund account) in the form of "fees." During the relevant period, the weekly transmittal reports revealed that in certain instances, Pension Fund directed only a minimal portion of its investors' funds be invested in mutual funds, in some cases allocating as much as 95% of the investor's contribution to "fees" to remain in Pension Fund's "Gross Premium" account.

13. In October 2003, one of the relationship representatives drafted a letter on HSBC letterhead announcing the new relationship between HSBC and Pension Fund, and inviting certain of Pension Fund's existing investors to transfer their funds from other financial institutions to HSBC. Pension Fund sent the letter to approximately half of its existing investors, and enclosed a form with the HSBC logo that listed the new mutual fund selections

6

available to investors upon transfer to HSBC. Neither the letter nor the enclosure informed investors that they would incur new front load fees in connection with that transfer, or the amounts of those prospective costs.

14. In February 2004, HSBC learned that some of the mutual fund companies were not charging Pension Fund's investors the full front load fees they had negotiated with Pension Fund. HSBC asked the mutual fund companies to rebook the trades and charge the higher front load fees for the Pension Fund investors. In return, some of the mutual fund companies required HSBC to provide them with hold-harmless letters. HSBC did not disclose the rebooking of these fees to Pension Fund's investors.

15. During 2004, one of the relationship representatives traveled to Central and South America four times at Pension Fund's request to meet with sales agents. Pension Fund asked the relationship representative to attend these meetings to add credibility to Pension Fund and its relationship with HSBC. Some investors attended at least one of these meetings. At these meetings, the relationship representative discussed HSBC's relationship with Pension Fund and, in one of these meetings, used a power-point presentation to describe different banking and investment services offered by HSBC.

16. In July 2004, certain of the relationship representatives first learned about a civil action brought against Pension Fund by the Guatemalan military pension fund, Instituto De Prevision Militar and Inverma S.A. ("IPM"), from an article in *Prensa Libre*, a Guatemalan newspaper. Instituto De Prevision Militar and Iverma S.A. v. Pension Fund of America, et al. Case No. 020730 CA 27 (Fla. Cir. Ct.) ("IPM civil action"). The newspaper reported that IPM had filed a suit in Florida state court in November 2002, alleging that Pension Fund had defrauded the Guatemalan military pension fund, and that its principals had misappropriated $24

7

million of pensioners' funds.  These relationship representatives met with Pension Fund's principals and Pension Fund's outside counsel to discuss IPM's allegations, and were told the allegations were "without merit."  HSBC accepted this representation.

17.	In September 2004, HSBC Holdings informed the relationship representatives that an HSBC branch office in Brazil had obtained copies of the Pension Fund marketing materials from an unaffiliated sales agent whose client was interested in investing in the trust plans. Among other things, the HSBC branch office in Brazil was concerned that the predominance of HSBC in the marketing brochure incorrectly implied that HSBC sponsored the trust plans. Thereafter, HSBC's compliance department, for the first time, reviewed Pension Fund's marketing brochures and the power point presentation used in Latin America.  The compliance department made some changes to the marketing brochures and the power point presentation. The compliance department did not, however, forward the marketing brochures or other materials to HSBC's legal department.  Moreover, although HSBC's compliance department did not complete its review of Pension Fund's marketing brochures until December 2004, HSBC allowed Pension Fund to continue to use its marketing brochures in all of its sales territories except Brazil.

18.	From August 2003 through March 28, 2005, HSBC earned trust and recordkeeping fees from Pension Fund, and fees paid by mutual fund companies in connection with investors' mutual fund transactions.

## V.  CLAIMS FOR RELIEF

### Violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act

19.	The Commission repeats and realleges paragraphs 1 through 18 of its Complaint.

8

20. During the Relevant Period, HSBC, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, as described in this Complaint, have: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices and courses of business which operated as a fraud or deceit upon purchasers and prospective purchasers of such securities.  A violation of these provisions may be established by a showing of negligence. *Aaron v. SEC*, 448 U.S. 680, 697 (1980).

21. By reason of the foregoing, HSBC, directly and indirectly, have violated Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3).

## **RELIEF REQUESTED**

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Disgorgement

Enter a Final Judgment ordering HSBC to pay disgorgement, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### II.

### Penalties

Enter a Final Judgment ordering HSBC to pay a civil penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

### III.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

### IV.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

September 19, 2007

Respectfully submitted,

By: _____
Roger Cruz
Senior Trial Counsel
Florida Bar No. 0157971
Direct Dial: (305) 982-6379
E-mail: cruzr@sec.gov

Teresa J. Verges
Assistant Regional Director
Florida Bar No. 0997651
Direct Dial: (305) 982-6384
E-mail: vergest@sec.gov

Yolanda Gonzalez
Branch Chief
Florida Bar No. 107042
Direct Dial: (305) 982-6390
Attorneys for Plaintiff

**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154

10

%JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**
SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**
HSBC BANK USA, N.A.

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   MIAMI-DADE
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Roger Cruz, Esq., (305) 982-6379
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800, Miami, FL 33131

Attorneys (If Known)
David H. Kistenbroker, Esq., Katten Muchin Rosenman, LLP,
525 West Monroe Street, Suite 1600 Chicago, Illinois 60661

(d) Check County Where Action Arose: ✓☐ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

Dade 07-22469-CIV-Seitz/McAliley

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only) |
|---|---|
| ✓ 1  U.S. Government Plaintiff | |
| ☐ 3  Federal Question (U.S. Government Not a Party) | |
| ☐ 2  U.S. Government Defendant | |
| ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) | |

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | PERSONAL PROPERTY | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)
✓ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Re-filed- (see VI below)   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).** (See instructions second page):
a) Re-filed Case ☐ YES ✓ NO    b) Related Cases ✓ YES ☐ NO
JUDGE Kevin Michael Moore    DOCKET NUMBER 05-20863 CIV-MOORE/GARBER

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. §§ 77 q(a)(2) and 77q(a)(3). Violation of the federal securities laws.
LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ Disgorgement and Civil Penalty   CHECK YES only if demanded in complaint: JURY DEMAND: ☐ Yes ✓ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
Roger Cruz, Esq.
SIGNATURE OF ATTORNEY OF RECORD
DATE 9/19/07

FOR OFFICE USE ONLY
AMOUNT _____   RECEIPT # _____   IFP _____